1
2
3
4
5
6
7
8                          UNITED STATES DISTRICT COURT

9                         CENTRAL DISTRICT OF CALIFORNIA

10

11  BETSY REID,                         )     NO. EDCV 04-968 MAN
                                        )
12                  Plaintiff,          )
                                        )     MEMORANDUM OPINION AND ORDER
13        v.                            )
                                        )
14  JO ANNE BARNHART,                   )
    Commissioner of the                 )
15  Social Security Administration,     )
                                        )
16                  Defendant.          )
    ————————————————————————————————————)
17

18        Plaintiff filed a Complaint on August 3, 2004, seeking review of

19  the denial by the Social Security Commissioner ("Commissioner") of

20  Plaintiff's application for disability insurance benefits ("DIB").  On

21  September 2, 2004, the parties filed a "Consent to Proceed Before a

22  United States Magistrate Judge," pursuant to 28 U.S.C. § 636(c).  The

23  parties filed a Joint Stipulation on May 17, 2005, in which:  Plaintiff

24  seeks an order reversing the Commissioner's decision and remanding for

25  the payment of benefits or, alternatively, for further administrative

26  proceedings; and Defendant requests that the Commissioner's decision be

27  affirmed.  The Court has taken the parties' Joint Stipulation under

28  submission without oral argument.

**SUMMARY OF ADMINISTRATIVE PROCEEDINGS**

Plaintiff filed her application for DIB on November 15, 2001. (Administrative Record ("A.R.") 64-66.) Plaintiff claims to have been disabled since July 26, 1999, due to depression, memory loss, fibromyalgia, chronic fatigue, overuse injury of the lower and upper extremities, neuropathy, and insomnia. (A.R. 16, 64.) She has past relevant experience as a waitress. (A.R. 16.)

The Commissioner denied Plaintiff's claim for benefits initially and upon reconsideration. On August 23, 2003, Plaintiff, who was represented by counsel, testified at a hearing before Administrative Law Judge F. Keith Varni ("ALJ"). (A.R. 696-725.) On September 16, 2003, the ALJ denied Plaintiff's request for benefits, and the Appeals Council subsequently affirmed the ALJ's decision. (A.R. 13-24, 4-6.)

**SUMMARY OF ADMINISTRATIVE DECISION**

In his September 16, 2003 written decision, the ALJ found that Plaintiff has not engaged in substantial gainful activity since her alleged onset date. (A.R. 23.) The ALJ found that Plaintiff: was an "individual closely approaching advanced age" as of the date of his decision and a "younger individual" as of her alleged disability onset date[1]; has a high school education; and has no transferable skills. (A.R. 24.) He further found that Plaintiff's impairments are "severe," but that Plaintiff does not have an impairment or combination of

---

1   Plaintiff was on February 19, 1952. (A.R. 64.)

2

impairments listed in, or medically equivalent to an impairment listed in, Appendix 1, Subpart P, Regulation No. 4.  (A.R. 23.)  In addition, the ALJ found that Plaintiff had the residual functional capacity for the relevant time period to perform "a significant range of light work" (A.R. 24) as follows:

> [Plaintiff can] lift and carry twenty pounds occasionally and ten pounds frequently; stand and walk six hours per eight-hour workday; [and] sit six hours per eight-hour workday. . . . She can perform no prolonged walking or any repetitive climbing, stooping, crouching, kneeling, crawling, handling, and fingering, but she has no mental functional limitations that limit the performance of basic mental work-related activities or any past relevant work.[2]

(A.R. 22.)

The ALJ further found that Plaintiff's allegations regarding her limitations were not credible.  (A.R. 24.)  The ALJ found that Plaintiff cannot perform her past relevant work, but based on the testimony of the vocational expert and using Medical-Vocational Rules 202.21 and 202.14 as a framework, she could perform a significant number of other jobs in

---

[2]    This refers to work at the "light" exertional level, which is defined as:  "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."  20 C.F.R. §§ 404.1567(b), 416.967(b).

1  the national economy.[3]   (*Id.*)   Accordingly, the ALJ concluded that

2  Plaintiff is not disabled within the meaning of the Social Security Act.

3  (*Id.*)

4

5                          **STANDARD OF REVIEW**

6

7      This Court reviews the Commissioner's decision to determine whether

8  it is free from legal error and supported by substantial evidence.

9  Smolen v. Chater, 80 F.3d 1273, 1279 (9th Cir. 1996).   The

10 Commissioner's decision must stand if it is supported by substantial

11 evidence and applies the appropriate legal standards.   Saelee v. Chater,

12 94 F.3d 520, 521 (9th Cir. 1996).   Substantial evidence is "more than a

13 mere scintilla but less than a preponderance -- it is such relevant

14 evidence that a reasonable mind might accept as adequate to support the

15 conclusion."   Moncada v. Chater, 60 F.3d 521, 523 (9th Cir. 1995).

16

17     Although this Court cannot substitute its discretion for that of

18 the Commissioner, this Court nonetheless must review the record as a

19 whole, "weighing both the evidence that supports and the evidence that

20 detracts from the [Commissioner's] conclusion."   Desrosiers v. Sec'y. of

21 Health and Human Serv., 846 F.2d 573, 576 (9th Cir. 1988); *see also*

22 Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985).   "The ALJ is

23 responsible for determining credibility, resolving conflicts in medical

24 ────────────────

25     3    Under Rule 202.21, a person who is limited to "light" work, is
   a "younger individual" and a "high school graduate or more," and is
26 "skilled or semi-skilled" with no "transferable" skills, is not
   disabled.    Under Rule 202.14, a claimant who is limited to "light"
27 work, "closely approaching advanced age," with a "high school education"
   and "no transferable skills," is "not disabled."   20 C.F.R. Pt. 220,
28 App. 2.

                                    4

1  testimony, and for resolving ambiguities." <u>Andrews v. Shalala</u>, 53 F.3d
2  1035, 1039-40 (9th Cir. 1995).   This Court must uphold the
3  Commissioner's decision if it is supported by substantial evidence and
4  free from legal error, even when the record reasonably supports more
5  than one rational interpretation of the evidence. *Id*. at 1041; *see also*
6  <u>Morgan v. Commissioner of the Soc. Sec. Admin.</u>, 169 F.3d 595, 599 (9th
7  Cir. 1999); <u>Flaten v. Secretary</u>, 44 F.3d 1453, 1457 (9th Cir. 1995).

8
9                              **DISCUSSION**
10
11       Plaintiff raises three issues in the Joint Stipulation.   <u>First</u>,
12  Plaintiff contends that the ALJ failed to consider properly and rejected
13  the opinions of Dr. David Ianacone, her treating physician, regarding
14  her physical and mental limitations.   <u>Second</u>, Plaintiff contends that
15  the ALJ failed to consider properly the evidence regarding Plaintiff's
16  mental impairments submitted by Larry Hairston, M.F.R., M.F.T.
17  ("Hairston"), her treating therapist.   <u>Third</u>, Plaintiff contends that
18  the ALJ did not pose a complete hypothetical to the vocational expert.
19  (Joint Stip. at 3.)

20
21       The Court addresses the first two issues together, and need not
22  reach the third issue, for the reasons discussed below.

23
24  **A.   <u>The ALJ Improperly Rejected Dr. Ianacone's Opinions</u>.**

25
26       Ordinarily, the opinions of a treating physician should be given
27  great weight, if not controlling weight. *See* Social Security Ruling 96-
28  2p; *see also* <u>Magallanes v. Bowen</u>, 881 F.2d 747, 751 (9th Cir.

                                    5

1989)(opinions of treating physicians are entitled to great deference).
When the ALJ rejects the opinion of a treating physician, even if it is
contradicted, the ALJ may reject that opinion only by providing specific
and legitimate reasons for doing so, supported by substantial evidence
in the record.  <u>Lester v. Chater</u>, 81 F.3d 821, 830 (9th Cir. 1995); *see
also* <u>Reddick v. Chater</u>, 157 F.3d 715, 725 (9th Cir. 1998)(ALJ erred by
rejecting the treating doctors' opinions and relying upon Social
Security examiners' opinions in finding that claimant's chronic fatigue
syndrome had not rendered her disabled).  Broad and vague reasons will
not suffice for rejecting the treating physician's opinion.  <u>McAllister
v. Sullivan</u>, 888 F.2d 599, 602 (9th Cir. 1989).  When a treating
doctor's opinion is uncontradicted, it may be rejected by an ALJ only
"for 'clear and convincing' reasons supported by substantial evidence in
the record."  <u>Holohan v. Massanari</u>, 246 F.3d 1195, 1202-03 (9th Cir.
2001)(citation omitted); <u>Reddick</u>, 157 F.3d at 725.

     In Dr. Ianacone's August 13, 2003 Residual Functional Capacity
Questionnaire, Dr. Ianacone diagnosed Plaintiff with major depression,
recurrent, and noted that Plaintiff has the following symptoms:
multiple tender points, non-restorative sleep, chronic fatigue, morning
stiffness, muscle weakness, frequent severe headaches, dysmenorrhea,
anxiety, panic attacks, depression, and chronic fatigue syndrome.  (A.R.
669-70.)  Dr. Ianacone responded "constantly" when asked to indicate if
Plaintiff's "pain and other symptoms [are] severe enough to interfere
with [her] attention and concentration needed to perform even simple
work tasks."  (A.R. 671.)  He further noted that she is "incapable of
even 'low stress' jobs" and would experience side effects from her
medication that "may have implications for working," such as drowsiness,

cognitive impairment, and constipation.  (*Id.*)

In describing her physical limitations, Dr. Ianacone found that Plaintiff:  can walk less than one city block without rest and without experiencing severe pain; can sit and stand up to ten minutes at one time; can sit, stand, or walk less than two hours in an eight-hour workday; would need periods of walking (between three to five minutes) up to every ten minutes during an eight-hour workday; must be able to shift positions at will from sitting, standing, or walking; would sometimes need to take hourly unscheduled breaks of up to 15 minutes during an eight-hour work day, and would need to lie down during such breaks; would need to elevate her legs with prolonged sitting; cannot lift; should never twist, stoop, bend, climb ladders, look down, or hold her head in a static position; and should rarely climb stairs, turn her head to the left or right, or look up.  (A.R. 672-73.)  Plaintiff would have "significant" limitations with respect to performing "repetitive" reaching, handling, or fingering, such that Plaintiff could grasp, turn, and twist objects up to 20% of an eight-hour workday; could use her fingers for fine manipulations up to 10% of an eight-hour workday; and could never use her arms for overhead reaching.  (A.R. 673.)  Dr. Ianacone further noted that Plaintiff's impairments are "likely to produce 'good days' and 'bad days,'" and she likely would be absent more than four days per month from work due to her impairments.  (*Id.*)

In rejecting the opinions of Dr. Ianacone, the ALJ explained:

I note that the current treating source assessments are based on a history of fibromyalgia and chronic neuropathic

pain that the reports from treating specialists did not in fact confirm.  The recent assessment of the pain management specialist, Dr. Ianacone, indicated diagnoses of fibromyalgia and major depression, but the reports of consulting and treating psychiatrists from 2002 indicated only nonspecific depressive and anxiety disorders secondary to pain with a possible personality disorder of mild to moderate severity.

. . . .

. . . Beginning in early 2003, [a] treating pain management specialist, Dr. Ianacone, reported that [Plaintiff] was "exquisitely sensitive" to opiate medication, could tolerate only low doses of such medication, and was unable to perform any work because of the exacerbations of pain that reduced her mobility.  Ex. 10F.

Dr. Ianacone indicated a similar opinion in August 2003 as well as indicating that [Plaintiff] could not lift ten pounds occasionally or stand, sit or walk for more than a few minutes at a time in a "*competitive work situation*," which was never defined.  Ex. 19F.  The doctor also found that [Plaintiff] had major depression, which no treating or consulting psychiatrist had found, and that [Plaintiff] was "constantly" unable to maintain concentration and attention to perform simple work tasks or to tolerate even "low stress" jobs because of her combination of physical and mental impairments.  I note also that this report was the first to

8

1    mention  chronic  fatigue  syndrome  although  the  doctor's
2    response is questionable, as is the whole report, since it was
3    noted on a form prepared by [Plaintiff's] representative in a
4    section asking the doctor to identify [Plaintiff's] symptoms.
5    The  record  does  not  establish  that  [Plaintiff]  has  major
6    depression,  and  the  doctor's  findings  are  based  on  the
7    doctor's perception of what constitutes a "*competitive work
8    situation*," which is not defined and is clearly beyond the
9    expertise of the doctor.   Furthermore, the clinical notes do
10   not  corroborate  the  finding  of  such  extreme  limits  and  are
11   clearly based on [Plaintiff's] self-reported history, which
12   the  records  from  1999,  2000,  and  early  2001  indicated  was
13   fairly  suspect.    Indeed,  the  current  treating  sources'
14   reliance at the end of 2001 and later on [Plaintiff's] history
15   renders their findings quite suspect.

16

17   (A.R. 19-21; emphasis in original.)

18

19        In determining Plaintiff's residual functional capacity, the ALJ
20   relied upon:  the January 12, 2002 report of Dr. Brian Huh, an internal
21   medicine  physician  who  examined  Plaintiff  at  the  request  of  the
22   Commissioner; the January 28, 2002 report of Dr. Reynaldo Abejuela, a
23   psychiatrist who examined Plaintiff at the request of the Commissioner;
24   and state agency physicians who reached conclusions similar to those
25   reached by Drs. Huh and Abejuela.   (A.R. 20.) In his January 12, 2002
26   report, Dr. Huh found that Plaintiff could perform work at the "light"
27   level, has "very little postural limitations with bending, stooping and
28   crouching," and has "very little manipulative limitations and [could

                                      9

perform manipulations] frequently," although he noted that Plaintiff would have a worsening of foot pain with lifting and carrying. (A.R. 260.)   In his January 28, 2002 report, Dr. Abejuela found that Plaintiff: would experience no episodes of emotional deterioration at work; is able to understand, carry out, and remember instructions without severe impairment; is able to relate to co-workers, supervisors, and others without severe impairment; is able to respond appropriately to work situations; is able to deal with changes in a routine work setting; and could follow simple and complex job instructions.[4]  (A.R. 265.)

     The ALJ concluded that Plaintiff has the following residual functional capacity:  "[Plaintiff can] lift and carry twenty pounds occasionally and ten pounds frequently; stand and walk six hours per eight-hour workday; sit six hours per eight-hour workday[; and] [s]he can perform no prolonged walking or any repetitive climbing, stooping, crouching, kneeling, crawling, handling, and fingering."   The ALJ further found that Plaintiff "has no mental functional limitations that

_____

     4    As noted above, the ALJ also relied upon state agency physicians' opinions.  (A.R. 277-84 -- January 24, 2002 Physical Residual Functional Capacity Assessment completed by Dr. Albert Lizarraras, a state agency physician, finding that Plaintiff is limited to work at the "light" level; is limited to standing, walking, and/or sitting about six hours in an eight-hour workday; has unlimited capabilities for pushing and pulling with the upper or lower extremities; and could "occasionally" balance, stoop, kneel, crouch, crawl, and climb ladders, ropes, and scaffolds; 269-72 -- February 5, 2002 Psychiatric Review Technique form completed by a state agency physician noting that Plaintiff's mental impairments are "not severe"; 273-74 -- March 19, 2002 Medical Consultant's Review Of Psychiatric Review Technique Form completed by Dr. Edward Wilson, another agency medical consultant, who agreed with the findings in the February 5, 2002 Psychiatric Review Technique form; 344 -- November 19, 2002 report completed by Dr. K. Gregg, a state agency physician, indicating that Plaintiff's mental impairment is "non-severe.")

1  limit the performance of basic mental work-related activities or any
2  past relevant work."  (A.R. 22, 24.)

3

4      To the extent that the ALJ rejected Dr. Ianacone's August 13, 2003
5  report on the grounds that Plaintiff's fibromyalgia and chronic
6  neuropathic pain were not confirmed by other "treating specialists," the
7  ALJ mischaracterized the record.  Indeed, the ALJ himself found that
8  Plaintiff suffered from fibromyalgia, and specifically noted Plaintiff's
9  neuropathy in his decision, stating that:  "[a] podiatric evaluation
10 indicated [Plaintiff's claimed leg and foot] pain was *neuropathic*, and
11 electrodiagnostic testing in January 2002 *found [signs] of generalized*
12 *peripheral neuropathy* and possible mild right carpal tunnel syndrome."
13 (A.R. 18; emphasis added.)  Moreover, the record demonstrates that a
14 diagnosis of fibromyalgia and attendant chronic pain were consistently
15 noted by Dr. Ianacone and other treating and examining physicians, and
16 confirms that Plaintiff was diagnosed with neuropathy based on objective
17 clinical findings.[5]  *See* Gallant v. Heckler, 753 F.2d 1450, 1456 (9th

18

19      5   (*See* A.R. 182 -- Dr. Joseph Warren's April 4, 2000 History and
   Physical Report noting "history of fibromyalgia"; 260 -- Dr. Huh's
20 January 12, 2002 opinion finding that Plaintiff has fibromyalgia based
   on his physical examination showing that she has all 18 of 18 tender
21 points; 322 -- Dr. Kris Hirata's May 31, 2002 progress record noting
   "chronic pain syndrome"; 326-28 -- April 12, 2002 neurology consultation
22 showing that "the study showed delayed sural conduction and possible
   right mild carpal tunnel syndrome" and diagnosing possible peripheral
23 neuropathy, chronic pain syndrome, and fibromyalgia; 331 -- Dr. E.
   Velarde's February 12, 2002 progress record diagnosing neuropathy,
24 depression, chronic back pain, and fibromyalgia; 332-33 -- January 15,
   2002 nerve conduction velocity study stating "[b]ilateral sural sensory
25 nerves show prolonged distal latencies" and "[a]bnormal
   electrodiagnostic study with findings consistent with a generalized
26 peripheral neuropathy and possible mild right carpal tunnel syndrome is
   also seen"; 348 -- Dr. Hirata's February 26, 2003 letter noting that a
27 January 15, 2002 nerve conduction study showed findings consistent with
   peripheral neuropathy and that on examination on December 4, 2001,
28 Plaintiff exhibited 13 of 18 tender points and was diagnosed with

Cir. 1984)(error for an ALJ to ignore or misstate the competent evidence in the record in order to justify his or her conclusions).  Furthermore, by definition, fibromyalgia is a condition that is difficult to diagnose and characterized by diffuse pain.[6]  Therefore, the ALJ's assumption that Dr. Ianacone's opinions were founded solely on Plaintiff's exaggerated complaints is in error.

In addition, the ALJ's rejection of Dr. Ianacone's February 13, 2003 opinion that Plaintiff's mobility is limited, as well as his rejection of Dr. Ianacone's findings in his August 13, 2003 report regarding Plaintiff's sitting, standing, and walking limitations, are not based on specific and legitimate reasons.  As noted above, the ALJ primarily rejected these limitations as not being corroborated by the record, and also noted that there is "no objective evidence of any significant functional limitation in terms of gait, station, or maneuverability."  (A.R. 20-21.)  However, while the record contains little mention, *per se*, of gait problems, it reflects Plaintiff's consistent complaint of numbness and tingling in her extremities, including her feet, in connection with her neuropathy, which objective

_____

chronic pain syndrome, fibromyalgia, and depression.)

6    *See* <u>Sarchet v. Chater</u>, 78 F.3d 305, 306 (7th Cir. 1996) ("fibromyalgia . . [is an] elusive and mysterious disease . . . . [Its] cause or causes are unknown, there is no cure, and, of greatest importance to disability law, its symptoms are entirely subjective."); <u>Rollins v. Massanari</u>, 261 F.3d 853, 855 (9th Cir. 2001)(quoting <u>Sarchet</u>, 78 F.3d at 307)("The principal symptoms [of fibromyalgia] are 'pain all over,' fatigue, disturbed sleep, stiffness, and ... multiple tender spots, more precisely 18 fixed locations on the body (and the rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia) that when pressed firmly cause the patient to flinch." ).

testing confirmed, as noted above.[7]   Indeed, Dr. Huh diagnosed Plaintiff with foot pain (which he stated may have resulted from her fibromyalgia but suspected resulted primarily from chronic tendinitis), and noted that her foot pain was increased by lifting and carrying.   (A.R. 259-60.)

Furthermore, the ALJ's reasons for rejecting Dr. Ianacone's opinions -- on the grounds that Dr. Ianacone failed to define the phrase "competitive work situation" and that any attempt by Dr. Ianacone to discuss Plaintiff's limitations in a "competitive work situation" is beyond his field of expertise -- are similarly neither specific nor legitimate.   The Commissioner frequently requests that state agency and examining physicians complete physical residual capacity assessment forms which require them to opine as to a claimant's physical limitations in the workplace.   The fact that the form was prepared by Plaintiff's counsel, rather than by the Commissioner, does not make it inherently unreliable, as the ALJ suggests.   *See* Lester, *supra*, 81 F.3d at 832 (ALJ improperly rejected treating doctors' opinion based in part on his unsupported and unwarranted speculation that these doctors were misrepresenting the claimant's condition).

---

7     (*See* A.R. 318 -- June 12, 2002 chart record noting that Plaintiff complained of "very painful feet for several years" and "numbness and tingling" in her feet; 337, 467 -- November 14, 2001 progress record noting "neuropathic burning/tingling [in] both feet"; 338 -- October 23, 2001 progress record noting increased pain in legs and feet; 441 -- July 15, 2002 chart record diagnosing "peripheral neuropathy with symptoms of burning pain in the hands and feet"; 469 -- September 17, 2001 progress record noting "severely tender [both] feet"; 470 -- October 23, 2001 progress record noting "[increased] pain in legs [and] feet"; 471 -- October 30, 2001 progress record noting leg cramps and back spasms.)

Plaintiff's contention -- that the ALJ improperly rejected Dr. Ianacone's opinions on the grounds that he had not indicated in his records that he had seen her on a "bad day" to corroborate his opinion regarding Plaintiff's absenteeism in the workplace -- is well-taken.  In so reasoning, the ALJ implicitly failed to follow the presumption that a treating doctor's opinions generally should be given controlling weight, because a treating doctor is in the best position to assess a claimant's limitations due to the nature of the relationship with the claimant and has the opportunity to see the claimant on numerous occasions over a period of time.[8]  *See* <u>Magallanes</u>, 881 F.2d at 751 (citing <u>Spraque v. Bowen</u>, 812 F.2d 1226, 1230 (9th Cir. 1987)("We afford greater weight to a treating physician's opinion because 'he is employed to cure and has a greater opportunity to know and observe the patient as an individual.'")  Instead, the ALJ relied upon the opinions of the examining physicians, who, unlike Dr. Ianacone, had only a short period of time to examine Plaintiff and assess her limitations.

Moreover, Dr. Ianacone set forth additional limitations (*e.g.*, preclusions on twisting and certain head and neck movements and the need for walk breaks and unscheduled breaks to lay down) that the ALJ

---

8    Especially as the record contains objective findings regarding Plaintiff's fibromyalgia and neuropathy and in view of the nature of fibromyalgia, to the extent that the ALJ found portions of Dr. Ianacone's opinions to be unclear as to their basis or vague, such as his use of the phrase "competitive work situation" or the basis of his opinion regarding Plaintiff's potential absenteeism in the workplace, he should have re-contacted Dr. Ianacone for clarification, instead of simply dismissing his opinions. *See* <u>Brown v. Heckler</u>, 713 F.2d 441, 442-43 (9th Cir. 1993)(The Commissioner has an affirmative duty to develop the record, even if the claimant is represented by counsel); 20 C.F.R. § 404.1512(e)(duty to re-contact treating physician); *see also* 20 C.F.R. § 404.1512a(b)(listing situations requiring a consultative examination, such as a conflict, inconsistency, ambiguity or insufficiency in the evidence).

14

improperly failed to address, much less provide specific and legitimate reasons for rejecting.  <u>Lester</u>, *supra*, 81 F.3d at 830; <u>Reddick</u>, *supra*, 157 F.3d at 725.

With respect to Plaintiff's mental limitations, the ALJ erred by failing to provide specific or legitimate reasons for rejecting the limitations found by Dr. Ianacone, *viz.*, that Plaintiff lacks the attention and concentration needed to perform even simple work tasks and is incapable of performing even a "low stress" job, and in finding that Plaintiff has no mental limitations.  In describing the treating records regarding Plaintiff's claimed mental impairment, the ALJ stated:

> The treating source records also indicate that [Plaintiff] has a history of depression.  When referred for psychiatric treatment at the end of 2001, there was a history of depression and sleeplessness related to chronic pain and fibromyalgia.  Ex 5F at 17.  The formal mental status examination finding of the treating therapist, a licensed clinical social worker, were unremarkable except for depressed and apprehensive mood with full affect, the examiner concluding that [Plaintiff] had a nonspecific (NOS) depressive disorder of moderate severity overall, assessing a Global Assessment of Functioning (GAF) score of 50.  Ex. 5F at 20.  A treating psychiatrist's findings and assessment in January 2002 were similar.  Ex 5F [at] 11.  By June 2002, the treating psychiatrist noted diagnoses of panic disorder with agoraphobia and personality disorder with histrionic and dependent features based on the reports of family problems

involving the apparent gambling addiction of [Plaintiff's]
spouse and recent problems with anxiety.  Ex. 5F at 4-6.  When
treatment was started under the pain management program, the
diagnosis became major depression even though formal mental
status examination findings remained unchanged, but formal
psychiatric treatment ended at that time.  Ex. 15F at 20-21.
As noted above, [Plaintiff] received counseling in 2002 and
2003 through the pain management program without any
indication of any significant change in [Plaintiff's] status.[9]

(A.R. 18-19.)

Th ALJ rejected Dr. Ianacone's opinions regarding Plaintiff's
mental limitations on the grounds that "no treating or consulting
psychiatrist" had found that Plaintiff has "major depression."  (A.R.
20-21.)  Although the ALJ recognized, as quoted above, that the treating
records contained evidence supporting the severity of Plaintiff's mental
impairment (*viz.*, diagnoses of depression and panic disorder, a GAF of
50, and years of counseling), he apparently disregarded this evidence
and found, instead, that Plaintiff has no mental limitations.

A review of the treating notes of Plaintiff's physicians and
therapists corroborate the mental limitations and diagnosis set forth by
Dr. Ianacone, and suggest that the ALJ's mental residual functional

_____

9    A GAF of 41-50 indicates "serious symptoms (e.g., suicidal
ideation, severe obsessive rituals, frequent shoplifting) or any serious
impairment in social, occupational, or school functioning (e.g., few
friends, unable to keep a job)."  Diagnostic and Statistical Manual of
Mental Disorders Text Revision, 34 (4th ed. 2000) ("DSM-IV-TR").

16

capacity finding is in error.  In addition to Dr. Ianacone, Plaintiff's treating therapist, Larry Hairston, specifically diagnosed Plaintiff with major depressive disorder.  (A.R. 497.)  Although his treating records do not expressly indicate that Plaintiff is "constantly" unable to maintain concentration and attention, they support Dr. Ianacone's opinion that Plaintiff has difficulty maintaining attention and concentration and dealing with stress; these treating records clearly demonstrate that Plaintiff's symptoms related to her mental impairment were far more than "unremarkable."[10]  Some of the mental health professionals (including Hairston) who treated Plaintiff were not licensed physicians; thus, they are not "accepted medical sources"

---

10      (*See, e.g.*, A.R. 288-89 -- June 19, 2002 report indicating that:  Plaintiff was experiencing anxiety and feeling that she "can't breath[e]," which is "sometimes . . . triggered by stress"; "when confronted by [a] situation [for which] she's unprepared she gets upset"; she exhibited "rambling" speech full of "hysterical qualities"; and she was diagnosed with panic disorder with agoraphobia, depression, not otherwise specified, and personality disorder with histrionic, dependent features; 298 -- January 15, 2002 and June 19, 2002 medication report indicating that Plaintiff was taking Prozac, Restoril, and Paxil; 304 -- December 20, 2001 Psychiatric Evaluation by Mark Seiberijig, L.C.S.W., diagnosing Plaintiff with depressive disorder, not otherwise specified, and poor sleep and assessing her with a GAF of 50; 313 -- July 15, 2002 chart notes by Dr. David Lee indicating that Plaintiff takes Valium for panic attacks and previously took Paxil for her panic attacks; 497-99 -- Hairston's January 21, 2002 Bio-Psychsocial Admission Assessment noting "poor" concentration, "bad" memory, "bad" energy, and "frequently" irritable; diagnosing her with major depression; and assessing her with a GAF of 65; 500-01 -- December 20, 2001 pain assessment notes indicating that Plaintiff experienced "pain, memory problems, depression, irritability, [and] agitation"; 523-27 -- Hairston's August 12, 2003 Mental Impairment Questionnaire indicating that Plaintiff had a current GAF of 70, with the highest GAF over the last year of 75, and noting the following symptoms:  poor memory, sleep disturbance, mood disturbance, social withdrawal or isolation, recurrent panic attacks, feelings of guilt or worthlessness, difficulty thinking or concentrating, decreased energy, generalized persistent anxiety, and would "often" experience deficiencies of concentration, persistence or pace resulting in failure to complete tasks in a timely manner in a work-like situation; 597-622 -- Hairston's Group therapy notes from April 9, 2002, to June 26, 2003; 634-39, 644-46 -- Hairston group therapy progress notes from January 10, 2002, to March 12, 2002.)

17

pursuant to 20 C.F.R. § 404.1513(a).  Nevertheless, their opinions and conclusions at least bolster Dr. Ianacone's opinions regarding Plaintiff's mental limitations.

Defendant contends that the ALJ properly rejected Dr. Ianacone's limitations on the grounds that Plaintiff's impairments were "responsive to medication," based on records suggesting that Plaintiff's pain could be controlled by her pain medication, methadone.  (Joint Stip. at 8-9, citing A.R. 315 -- Dr. David Lee's July 15, 2002 report that Plaintiff's chronic pain syndrome was "currently controlled" with methadone; 343 -- Dr. Hand C. Guisses's November 7, 2002 note that Plaintiff's pain was "well controlled" with medication.)  As noted above, Dr. Ianacone specifically noted that Plaintiff experiences side effects that might affect her in the workplace, *to wit*, "drowsiness, cognitive impairment, [and] constipation."  (A.R. 671.)  The manufacturers of methadone, a strong narcotic medication, caution that:

> Methadone may impair the mental and/or physical abilities required for the performance of potentially hazardous tasks, such as driving a car or operating machinery.  The patient should be cautioned accordingly.  Methadone, like other narcotics, may produce orthostatic hypotension in ambulatory patients.[11]

---

11  Orthostatic hypotension consists of symptoms of dizziness, faintness, or lightheadedness which appear only on standing, and are caused by low blood pressure.

18

PHYSICIAN'S DESK REFERENCE, p. 2756 (53d ed. 1999).  Thus, based on this warning and in view of the side effects Dr. Ianacone noted, at least some of the limitations found by Dr. Ianacone, such as impaired concentration and attention, as well as fatigue and limitations regarding her movement and manipulation skills, are consistent with and may have resulted, in part, from the side effects of Plaintiff's medication.

Finally, the evidence upon which the ALJ relied -- the reports of Dr. Huh, Dr. Abejuela, and the state agency physicians -- did not constitute substantial evidence of Plaintiff's residual functional capacity.  Significantly, it is unclear whether Dr. Huh or Dr. Abejuela based their opinions on sufficient evidence, including all of the objective testing and a complete set of Plaintiff's treating records.[12] (See A.R. 256 -- Dr. Huh's report indicating that he had only a portion of Plaintiff's records and objective testing:  a 1998 nerve conduction study, a March 31, 2000 stress echocardiogram, and a September 22, 2000 CT scan of the lumbar spine; 261-66 -- Dr. Abejuela's report simply indicating that he reviewed "progress notes stating that [Plaintiff] has fibromyalgia and depression" and that "[a] report from Kaiser Permanente was also reviewed.")  Similarly, the evidence submitted by the state agency physicians does not constitute a proper basis for the ALJ's

---

12    See 20 C.F.R. §§ 404.1517, 416.917 ("[i]f we arrange for [a consultative] examination or test, . . . [w]e will also give the examiner any necessary background information about your condition."); See also Ladue v. Chater, 1996 WL 83880, *5 (N.D. Cal. 1996)(requiring remand where "[t]he ALJ failed to conform to 20 C.F.R. § 404.1517 requiring that the consultative examiner be provided with necessary background information regarding the claimant's condition [and] it appears from the record that the ALJ gave Dr. Mehta's consultative report considerable weight, even though Dr. Mehta was lacking important background information regarding plaintiff").

conclusion.[13]

Accordingly, the ALJ's rejection of Dr. Ianacone's opinions constitutes reversible error.

**B.   Remand For An Award Of Benefits Is Appropriate.**

When the Court has found that evidence, such as physician opinion and/or claimant testimony, has been improperly rejected by the ALJ based on inadequate reasons, the evidence should be credited and an immediate award of benefits directed, rather than a remand for further proceedings, when: "(1) the ALJ failed to provide legally sufficient reasons for rejecting the evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited." Benecke v. McCarthy, 379 F.3d 587, 593 (9th Cir. 2004); *see also* Harman v. Apfel, 211 F.3d 1172, 1178 (9th Cir. 2000); Smolen, 80 F.3d at 1292.

The first element is satisfied in this case given, for the reasons set forth above, that the ALJ improperly rejected the opinions of Dr. Ianacone. Significantly, even if there were evidence of record "upon which the ALJ legitimately could have rejected" the opinions of Dr.

---

13   For instance, although Dr. Gregg, the state agency physician who found that Plaintiff's mental impairment was "non-severe," stated that he "reviewed all the evidence in the file and the assessment is affirmed," he did not describe what evidence, in fact, supported this conclusion. (A.R. 344.) In addition, Dr. Lizarraras did not indicate that he reviewed the treating records but, rather, indicated that he relied on the conclusions of Dr. Huh, whose opinions were not supported by substantial evidence, as noted above. (A.R. 282.)

Ianacone, it would not matter, because if the above test is met, remand for payment of benefits "is warranted regardless of whether the ALJ *might* have articulated" such a justification. <u>Harman</u>, 211 F.3d at 1178-79. *See also* <u>Benecke</u>, 379 F.3d at 593 (when the test is met, remand is not warranted in order to allow the ALJ to make specific findings regarding a claimant's subjective symptom testimony).   When the first element is met, the Court must credit the subject evidence as true. *Id.* at 593-94; <u>Lester</u>, 81 F.3d at 834.

Thus, crediting the rejected opinion of Dr. Ianacone as "true," the next questions are:   whether there are any outstanding issues that must be resolved before a determination of disability can be made; and whether it is clear from the record that the ALJ would be required to find Plaintiff disabled had he properly credited such evidence. <u>Benecke</u>, 379 F.3d at 594.   Here, the vocational expert testified that a claimant with the limitations found by Dr. Ianacone in his August 19, 2003 report would be unemployable.[14]   (A.R. 720-21.)

If credited, the rejected opinion of Dr. Ianacone established that Plaintiff is disabled.   As a vocational expert has testified about the effect of Dr. Ianacone's opinions, had they been properly credited, on the disability question, there is no outstanding issue that must be

_____

14   Specifically, the ALJ questioned the vocational expert: "[T]here's an assessment in Exhibit 19F from [Dr. Ianacone], and this says that [Plaintiff] can't . . . stand or walk for even two hours a day.   That would not be compatible with competitive work, either?," to which the vocational expert replied, "Correct."   (A.R. 720-21.)

1 resolved before a determination of disability can be made.[15] <u>Harman</u>, 211
2 F.3d at 1180 (collecting Ninth Circuit cases in which a remand for
3 payment of benefits, based on the improper rejection of medical
4 testimony, was appropriate, because there was testimony from a
5 vocational expert that the limitations found in the rejected opinion
6 would render the claimant unable to engage in any work). Hence, the
7 second and third factors of the above test are satisfied and a remand
8 for an award of benefits is appropriate.

9

10 As the <u>Benecke</u> test has been satisfied, this case should be
11 remanded for an award of benefits.

12

13 **CONCLUSION**

14

15 Accordingly, for the reasons stated above, IT IS ORDERED that the
16 Commissioner's decision denying benefits is REVERSED, and this case is
17 REMANDED for an award of benefits, consistent with this Memorandum
18 Opinion and Order. Judgment shall be entered reversing the decision of
19 the Commissioner, and remanding the matter for such an award and any
20 further necessary administrative action, consistent with this Memorandum
21 Opinion and Order.

22 ///

23 ///

24 ///

25 ///

26 _____

27 15 As this physician opinion is sufficient for a disability
finding for the reasons discussed *infra*, the Court need not additionally
determine whether, if Plaintiff's testimony were also to be credited,
28 she would be found disabled.

IT IS FURTHER ORDERED that the Clerk of the Court shall serve copies of this Memorandum Opinion and Order and the Judgment on counsel for Plaintiff and for Defendant.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

DATED: September 29, 2006

_____
MARGARET A. NAGLE
UNITED STATES MAGISTRATE JUDGE

23